# In the United States Court of Federal Claims
BID PROTEST

|  |  |
|---|---|
| BTAS, INC., ) | |
| ) | |
| Plaintiff, ) | No. 20-1176C |
| ) | (Filed Under Seal: January 21, 2021 \| |
| v. ) | Reissued: January 27, 2021)* |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

*Samuel S. Finnerty*, PilieroMazza PLLC, Washington, DC, for Plaintiff. *Patrick R. Rothwell*, *Timothy F. Valley, Meghan F. Leemon,* and *Anna R. Wright*, PilieroMazza PLLC, Washington, DC, Of Counsel.

*Sonia W. Murphy*, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Jeffrey Bossert Clark*, Acting Assistant Attorney General, for Defendant.

**OPINION AND ORDER**

**KAPLAN, Judge.**

The General Services Administration ("GSA") awarded plaintiff, BTAS, Inc. ("BTAS"), a small business set-aside contract. After one of BTAS's competitors filed a size protest with the Small Business Administration ("SBA"), the SBA's regional office and then its Office of Hearings and Appeals ("OHA") concluded that BTAS was ineligible to be treated as a small business because BTAS's average annual receipts over the preceding three years exceeded $38.5 million, the limit set forth in the applicable size standard.

In this bid protest, BTAS contends that OHA's ruling was inconsistent with law. It argues that as a result of an amendment to the Small Business Act contained in the Small Business Runway Extension Act of 2018, Pub. L. No. 115-324, 132 Stat. 4444 ("Runway Extension Act"), the SBA was obligated to use a period of no less than five years to calculate BTAS's average

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. In a joint response, the parties notified the Court that they had no proposed redactions and the opinion could be released in full.

annual receipts. It is undisputed that if a five-year rather than three-year period had been used, BTAS's average annual receipts would not have exceeded the $38.5 million ceiling.

The government opposes BTAS's claim on several grounds. First, it contends that BTAS waived its argument that the Runway Extension Act required the SBA to use the longer averaging period because BTAS did not raise it before the time for submitting offers had expired. In any event, according to the government, the provision of the Small Business Act that was amended by the Runway Extension Act, namely section 3(a)(2)(C)(ii), 15 U.S.C. § 632(a)(2)(C)(ii), does not apply to the SBA's size standards but rather to alternative standards that other agencies are statutorily permitted to issue subject to SBA approval. Further, according to the government, even if section 3(a)(2)(C)(ii) were applicable here, the five-year averaging period did not apply to offers submitted before January 6, 2020—the effective date of the final rule the SBA ultimately issued, which adopted a five-year averaging period.

For the reasons set forth below, the Court finds that the government's waiver argument lacks merit. It agrees, however, that section 3(a)(2)(C)(ii) does not impose limitations on the SBA's prescription of size standards; instead it applies to agencies and departments other than the SBA that lack independent statutory authority to promulgate size standards. Moreover, even if section 3(a)(2)(C)(ii) did apply to the SBA, the three-year averaging period required under existing regulations remained in effect until the SBA—after providing notice and an opportunity for public comment—amended its regulations to codify the five-year averaging period. Therefore, the government's motion for judgment on the administrative record is **GRANTED**, ECF No. 22, and BTAS's cross-motion is **DENIED**, ECF No. 21.

## BACKGROUND

**I.      Statutory and Regulatory Overview**

Under section 3(a)(1) of the Small Business Act, "a small-business concern" is defined as an enterprise "which is independently owned and operated and which is not dominant in its field of operation." 15 U.S.C. § 632(a)(1). Section 3(a)(2) of the Act, 15 U.S.C. § 632(a)(2), governs the establishment of the criteria that determine which business concerns fall within this definition.

First, subparagraph (A) of § 632(a)(2) states in pertinent part that "the [SBA] Administrator may specify detailed definitions or standards by which a business concern may be determined to be a small business concern for the purpose of this chapter or any other Act." Subparagraph (B) further specifies that the standards that the SBA promulgates "may utilize number of employees, dollar volume of business, net worth, net income, a combination thereof, or other appropriate factors." 15 U.S.C. § 632(a)(2)(B).[1]

---

[1] In specifying that the SBA may consider number of employees, dollar volume, etc., to determine whether a business is "small," section 3(a)(2)(B) references "[t]he standards described in paragraph (1)." 15 U.S.C. § 632(a)(2)(B). Although not especially material to the issues before the Court, the reference to "paragraph (1)" appears to be an error. Paragraph (1) provides a general definition of a "small-business concern." It is actually subsection (a)(2)(A) and not

Pursuant to its statutory authority under subparagraphs (A) and (B) of section 3(a)(2), the SBA has issued regulatory "size standards" that "define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns." 13 C.F.R. § 121.101(a). These "[s]ize standards have been established for types of economic activity, or industry, generally under the North American Industry Classification System (NAICS)." Id. The SBA's size standards are generally based on either the number of employees of the business or its annual receipts. 13 C.F.R. § 121.201; see also Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1247 (Fed. Cir. 2015).

As the SBA's regulations state, "[f]ederal agencies or departments promulgating regulations relating to small businesses usually use SBA size criteria," but may employ their own standards in "limited circumstances" where "the SBA size standard is not suitable for their programs." 13 C.F.R. § 121.903(a). This option is subject to subparagraph (C) of section 3(a)(2), which provides that federal agencies or departments that wish to employ their own size standards must comply with certain statutory conditions. 15 U.S.C. § 632(a)(2)(C). Among other things, they must secure the approval of the SBA Administrator through the regulatory procedures the SBA has established, 15 U.S.C. § 632(a)(2)(C)(iii), see also 13 C.F.R. § 121.903(a)(5), and they must provide notice of their proposed standards for public comment, 15 U.S.C. § 632(a)(2)(C)(i).

In addition, subclause (II) of section 3(a)(2)(C)(ii) provides in pertinent part that "[u]nless specifically authorized by statute, no Federal department or agency may prescribe a size standard for categorizing a business concern as a small business concern, unless such proposed size standard" "provides for determining . . . the size of a business concern providing services on the basis of the annual average gross receipts of the business concern over a period of not less than 5 years." 15 U.S.C. § 632(a)(2)(C)(ii)(II). Significantly for the purposes of the issues in this case, before the Runway Extension Act was signed into law in December of 2018, the averaging period set forth in section 3(a)(2)(C)(ii)(II) of the Small Business Act was three years. The Runway Extension Act directed that the number "5" be substituted for the number "3." Beyond that change, however, section 3(a)(2), including the remainder of subparagraph (C), were unchanged.

## II.   The Procurement

GSA administers "One Acquisition Solution for Integrated Services—Small Business" ("OASIS SB"), a multiple award, indefinite delivery/indefinite quantity contract program that federal agencies and other entities can use to secure a variety of professional, scientific, and technical services. Admin. R. ("AR") Tab 30 at 3938, ECF No. 18; AR Tab 3 at 62, ECF No. 15. GSA originally awarded contracts under the Solicitation—No. GS00Q-13-DR-0002—in 2014. AR Tab 1 at 3, ECF No. 15. On April 29, 2019, GSA re-opened the Solicitation and added approximately 160 additional contractors to the Pool 3 contract vehicle, which includes small businesses that meet the size standard of $38.5 million under NAICS code 541330 (engineering services). AR Tab 3 at 61−62, 268.30.

---

subsection (a)(1) that gives the SBA the authority to promulgate "detailed definitions or standards" for determining whether a business concern is a small-business concern.

On May 7, 2019, GSA held a presentation for potential offerors. See AR Tab 13 at 1163, ECF No. 15. The presentation included a slide addressing the impact on the procurement of the then only recently-enacted Runway Extension Act. Id. at 1269. GSA advised attendees that until the SBA issued further direction, agencies would continue to use the three-year standard to determine size status. Id.; see also AR Tab 7 at 643, ECF No. 15 (June 6, 2019 GSA response to question regarding the applicability of the Runway Extension Act stating that "[t]he SBA has released their response on this matter, which states that until the SBA issues further direction, agencies will continue to use the previous standard of 3 years when determining size status"). And GSA notified potential offerors that it "lack[ed] the authority to deviate from the SBA's current regulations, which specify a 3 year size standard, absent coordination and concurrence from the SBA." AR Tab 7 at 643 (Q&A 27); see also id. (Q&A 28); id. at 644 (Q&A 33); id. at 648 (Q&A 64); id. at 665−66 (Q&A 200).

In the meantime, on June 24, 2019, the SBA issued a notice in the Federal Register proposing that the three-year averaging period be changed to a five-year period. SBA Notice of Proposed Rulemaking, 84 Fed. Reg. 29399 (June 24, 2019). In the notice, the SBA asserted that the change was discretionary and not statutorily required. The SBA observed that it had long been the agency's position that the conditions set forth in section 3(a)(2)(C) of the Small Business Act (including the minimum averaging period) do not apply to the SBA's regulations, which are issued pursuant to section 3(a)(2)(A) and (B). According to the SBA, it was proposing to adopt the new five-year minimum averaging period "to promote consistency" with the size standards other agencies issued under section 3(a)(2)(C). Id.

On June 25, 2019, GSA issued Amendment 7 to the Solicitation. AR Tab 10 at 1102, ECF No. 15. Among other things, the Amendment stated that "[c]onsistent with the terms of the Solicitation regarding size status, GSA will not make determinations regarding the status of a concern as a small business." Id. at 1104. It further stated that "[s]hould matters concerning size status representations arise, they will be referred to the SBA in accordance with FAR Subpart 19.3." Id.

Plaintiff BTAS, a woman-owned small business that provides information technology services to federal agencies, submitted its offer the next day, on June 26, 2019. AR Tab 14b at 1339, 1357, ECF No. 16. Its offer included the required self-certification that it was a small business concern and that it met the $38.5 million small business size standard specified in the Solicitation. Id. at 1357.[2] On May 29, 2020, GSA issued a list of awardees for the OASIS SB Pool 3 Contract. AR Tab 22 at 3064, ECF No. 18; AR Tab 24 at 3210, ECF No. 18. BTAS was named as an awardee on the list. AR Tab 22 at 3065.

### III. The Size Protest Before the SBA

---

[2] Pursuant to the SBA's regulations, an offeror's size status is determined "as of the date the [offeror] submits a written self-certification that it is small . . . as part of its initial offer." 13 C.F.R. § 121.404(h); see also FAR 19.301-1(a) (discussing self-certification). After self-certification, the qualifying business is "considered to be a small business throughout the life of that contract." 13 C.F.R. § 121.404(g).

4

On June 1, 2020, an unsuccessful offeror for the OASIS SB Pool 3 procurement filed a size protest with the SBA, challenging BTAS's designation as a small business and therefore its eligibility for an award under the terms of the Solicitation. AR Tab 27 at 3221, ECF No. 18; see AR Tab 28 at 3492–93, ECF No. 18; see also 13 C.F.R. § 121.1001(a)(1).³ The protester alleged that BTAS was ineligible for an award because its average revenue over the three years preceding the Solicitation was greater than $38.5 million. AR Tab 27 at 3225.

On June 18, 2020, Area Office IV issued Size Determination No. 04-2020-027. AR Tab 30 at 3938–40. The Area Office found that—in accordance with the rule that the SBA issued in final form on December 5, 2019—the new five-year averaging period would not apply to proposals submitted before January 6, 2020. AR Tab 31 at 3940, ECF No. 18; see 84 Fed. Reg. 66561 (December 5, 2019). Because the SBA found that BTAS did not meet the $38.5 million limit as calculated on the basis of its last three years of annual receipts, GSA removed BTAS from its list of awardees for the Pool 3 contract. AR Tab 30 at 3938–40.

BTAS appealed the Area Office's decision to OHA. Size Appeal of BTAS, Inc., SBA No. SIZ-6063, 2020 WL 5093292 (Aug. 11, 2020) ("Size Appeal"). On appeal, BTAS contended that the Area Office's decision was contrary to law to the extent that it was based upon the SBA's position that subsection (a)(2)(C)(ii)(II) of the Small Business Act does not apply to the SBA. It also argued that the effect of the amendment to that provision contained in the Runway Extension Act was to immediately nullify the then-existing regulation which provided for a three-year averaging period.

Expressly declining to address whether section 3(a)(2)(C) of the Small Business Act applies to the SBA, OHA denied BTAS's appeal. Relying on prior OHA precedent,⁴ it rejected BTAS's argument that the three-year averaging period was immediately superseded and replaced with a five-year period upon the enactment of the Runway Extension Act. Size Appeal at 12. OHA reasoned that "the Runway Extension Act amended only a single sentence of the Small Business Act, and the provision amended pertains specifically to the promulgation of size standards, not to the methodology used to calculate the size of a particular business." Id. at 11. In addition, it agreed that the amendment "did not alter the requirements for notice-and-comment rulemaking and approval by the SBA Administrator." Id. at 12. Because new size standards "can only be implemented by adhering to these requirements," OHA concluded, there was no merit to BTAS's argument that the Runway Extension Act "overrule[d]" the SBA's existing regulations. Id. Therefore, OHA held, the applicable size standard at the time of BTAS's self-certification was based on the three-year averaging period and BTAS's appeal was rejected. Id. at 13.

---

³ An unsuccessful offeror in a procurement set-aside for small businesses may lodge a size status protest. 13 C.F.R. § 121.1001(a)(1); FAR 19.301-1(b). Size protests are adjudicated by the appropriate SBA Area Office. 13 C.F.R. § 121.1002; FAR 19.301-1(c); FAR 19.302(f)(1), (h). The Area Office's decision is subject to review by OHA, whose decision constitutes "the final decision of the SBA." 13 C.F.R. § 134.316(d).

⁴ Size Appeal of Cypher Analytics, Inc. d/b/a Crown Point Systems, SBA No. SIZ-6022 (Aug. 27, 2019), Size Appeal of Advanced Technology Systems Co., SBA No. SIZ-6034 (Oct. 25, 2019), and Size Appeal of Diversified Protection Corp., SBA No. SIZ-6042 (Dec. 20, 2019).

**IV.   This Action**

BTAS filed its bid protest here on September 10, 2020. ECF No. 1. It contends that the SBA's decision that a three-year averaging period must be used to determine whether BTAS's annual receipts were less than $38.5 million is contrary to law. The government filed the administrative record on October 5, 2020, ECF No. 13, and on October 19, 2020, BTAS filed a motion for judgment on the administrative record, ECF No. 21. The government filed its cross-motion and response in opposition to Plaintiff's motion on November 2, 2020. ECF No. 22. Oral argument on the parties' cross-motions was held via video conference on December 17, 2020. In addition, at the Court's request, the parties filed simultaneous supplemental briefs after oral argument addressing the impact of the court of appeals' decision in Boeing Co. v. United States, 968 F.3d 1371 (Fed. Cir. 2020) on the government's waiver argument.

## DISCUSSION

**I.   Subject Matter Jurisdiction**

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b). That statute grants the Court the authority to "render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement"). OHA determinations that an offeror does not meet required size standards "are actions 'in connection with a proposed procurement,'" and thus "within the scope of jurisdiction granted under the Tucker Act." Palladian Partners, 783 F.3d at 1254 (quoting 28 U.S.C. § 1491); see also Dorado Servs., Inc. v. United States, 128 Fed. Cl. 375, 383 (2016) (explaining that SBA determinations regarding a business concern's eligibility for set-aside contracts are made "in connection with a procurement").

As required by the statute, a plaintiff must be an "interested party"—i.e., an actual or prospective offeror—to have standing to invoke the Court's bid protest jurisdiction. CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015) (quoting 28 U.S.C. § 1491(b)(1)); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002). An interested party has standing if it has incurred "a non-trivial competitive injury" as a result of alleged errors in the procurement. CGI Fed. Inc., 779 F.3d at 1351 (quoting Weeks Marine Inc. v. United States, 575 F.3d 1352, 1361–62 (Fed. Cir. 2009)); see also Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (holding that "prejudice (or injury) is a necessary element of standing").

BTAS is an interested party and thus has standing to bring this protest. It submitted an offer and was selected as an awardee for an OASIS Small Business Pool 3 contract, AR Tab 22 at 3065, and was therefore "an actual . . . bidder" with "a direct economic interest in the procurement," Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (citing Rex. Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)). But for what it alleges was the SBA's erroneous determination, BTAS's contract award would not have been set aside. See Sys. Application & Techs., Inc., 691 F.3d at 1382 (finding standing where the awardee suffered a "non-trivial competitive injury," when the procuring agency deprived that awardee of the contract). Thus, BTAS has standing to bring this protest.

**II.     Standard for Granting Judgment on the Administrative Record**

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005); see also 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Bannum, Inc., 404 F.3d at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007), aff'd, 285 Fed. App'x 746 (Fed. Cir. 2008) (citing A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)). The Court's inquiry is thus "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc., 72 Fed. Cl. at 131 (citing Bannum, 404 F.3d at 1356).

**III.    Standard of Review in Bid Protest Cases**

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Therefore, in order to successfully challenge an agency's procurement decision, a protestor must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Bannum, Inc., 404 F.3d at 1351. This "highly deferential" standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

**IV.     Waiver**

As noted, BTAS contends that the SBA committed legal error when it used a three-year rather than five-year period to determine BTAS's average annual receipts. The government argues, however, that under the reasoning of Blue & Gold Fleet, L.P. v. United States 492 F.3d 1308, 1313 (Fed. Cir. 2007), BTAS waived its right to judicial review of this legal issue by

failing to file a protest with either GAO or this court before the Solicitation closed. See Def.'s Mot. for J. on the Admin. R. and Opp'n to Pl.'s Cross-Mot. for J. on the Admin. R. at 19–20, ECF No. 22; Def.'s Reply in Supp. of its Cross-Mot. for J. on the Admin. R. at 3–6, ECF No. 24.

The government's waiver argument lacks merit. Blue & Gold established a general rule that to challenge the terms of a solicitation before this court, the protestor must raise its objections before the solicitation closes. 492 F.3d at 1313; see also COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1382 (Fed. Cir. 2012). But in this case BTAS is not challenging the terms of the Solicitation; it is appealing the size determination the SBA made after the award decision in the context of a size protest filed by one of BTAS's competitors.

Indeed, the Solicitation expressly disclaims any role by GSA in size determination matters. As noted above, Amendment 7 states that "GSA will not make determinations regarding the status of a concern as a small business" and that "[s]hould matters concerning size status representations arise, they will be referred to the SBA in accordance with FAR Subpart 19.3." AR Tab 10 at 1104. And while Amendment 4 advised prospective offerors of the SBA's position that agencies would continue to use a three-year period until the SBA issued further direction, by so advising them GSA did not make the three-year period a term of the Solicitation; it merely communicated to them the SBA's views and intentions, as well as its own lack of authority on the matter.

Furthermore, the Court notes that because the appropriate averaging period is not addressed in the Solicitation, and because it is the SBA in the first instance that has the exclusive authority to make size determinations, it is difficult to see what relief the Court could have given BTAS had it filed a protest before the Solicitation closed, as the government claims it was required to do. Ordinarily, if the terms of a solicitation are defective, then the Court can preclude an agency from proceeding with the procurement unless it corrects the defect. The point of the Blue and Gold rule is that by correcting the defect before the solicitation period ends, the agency can avoid spending time and resources evaluating proposals and making award decisions that may have to be reversed because of defects in the Solicitation. See 492 F.3d at 1313 ("[r]ecognition of a waiver rule, which requires that a party object to solicitation terms during the bidding process, furthers this statutory mandate" for the "'expeditious resolution'" of bid protests) (quoting 28 U.S.C. §1491(b)(3)). But here it would not have been efficient to have had BTAS file an earlier protest because the party whose actions BTAS would have been protesting would be GSA, which lacks the authority to make size determinations. No matter what GSA stated in its Solicitation, an unsuccessful offeror would have the right to file a size protest with the SBA after the award decision was made, leading us to the same place we are now. For that reason, among others, the issue BTAS presses here would not have been ripe for review had BTAS filed a pre-award protest as the government states it was required to do.

Finally, the Court is cognizant of the fact that GAO considered two protests in this procurement that were filed before the Solicitation closed and in which the protesters argued that the Runway Extension Act required the use of a five-year averaging period to determine their size status. TechAnax, LLC; Rigil Corp., 2019 CPD P 294, B-408685.22 (Comp. Gen. Aug. 16, 2019). GSA argued that GAO should dismiss the protests because GSA "issued the RFP based on guidance provided by SBA, and because that guidance concerns matters within the exclusive jurisdiction of SBA that [GAO] does not review as part of [its] bid protest function." Id. at 3.

8

GAO rejected GSA's argument, reasoning that "[a]lthough [it] w[ould] not review SBA's issuance or amendment of size standards, the protesters argue primarily that the effective date of the Runway Extension Act applies to this solicitation." Id. at 4. "Therefore," GAO stated, it would consider "whether the Runway Extension Act imposed requirements that obligated GSA to include terms in the solicitation implementing the change to the number of years to be considered in calculating a firm's average revenue." Id.

Respectfully, the Court is not persuaded by the distinction GAO drew between "review [of] SBA's issuance or amendment of size standards" (which it acknowledges is outside of its purview) and review of whether "the effective date of the Runway Extension Act applies to this solicitation." Id. at 4. In fact, the Court is not sure what it means for a statutory effective date to "appl[y]" to a solicitation. Id. Moreover, because GAO ruled against the protesters, it was not required to fashion corrective action for GSA to take as GAO would have if it had sustained the protest. Requiring GSA to state in the Solicitation that the Runway Extension Act mandated the use of a five-year averaging period would have been an empty promise, given that size determinations are made by the SBA and not GSA.

In short, the government's waiver argument is unpersuasive. The Court turns, therefore, to the merits of BTAS's arguments.

**V.    Merits**

**A.    The SBA is not Subject to the Restrictions Contained at Section 3(a)(2)(C) of the Small Business Act as Amended by the Runway Extension Act**

The first issue before the Court on the merits is whether section 3(a)(2)(C) of the Small Business Act—which was amended by the Runway Extension Act—applies to the SBA's promulgation of standards for categorizing businesses as "small." 15 U.S.C. § 632(a)(2)(C)(ii)(II). While OHA found it unnecessary to address the issue, in the Court's view this is a threshold question that should be addressed because answering it will determine whether the Runway Extension Act has any bearing on this matter in the first instance.

As described above, section 3(a)(2)(C) of the Small Business Act states in pertinent part that "[u]nless specifically authorized by statute, no Federal department or agency may prescribe a size standard for categorizing a business concern as a small business concern" unless the proposed size standard meets certain requirements, including (as amended by the Runway Extension Act) that the standard "provides for determining . . . the size of the business concern providing services on the basis of annual average gross receipts of the business concern over a period of not less than 5 years." 15 U.S.C. § 632(a)(2)(C)(ii)(II).

The SBA's longstanding position is that section 3(a)(2)(C) does not apply to the size standards the SBA promulgates, but rather to alternative size standards that other federal agencies and departments propose to use, and which the SBA must approve. In the Court's view, the SBA's interpretation is correct.

"[T]he 'starting point in every case involving construction of a statute is the language itself.'" Gilead Scis., Inc. v. Lee, 778 F.3d 1341, 1347 (Fed. Cir. 2015) (quoting United States v. Hohri, 482 U.S. 64, 69 (1987)). "The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Applications in Internet Time, LLC v. RPX Corp., 897 F.3d 1336, 1346 (Fed. Cir. 2018) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)). In making that determination, the Court must read the words of a statute "in their context and with a view to their place in the overall statutory scheme." Applications in Internet Time, LLC, 897 F.3d at 1346 (quoting King v. Burwell, 576 U.S. 473, 486 (2015)). "This is because statutory '[a]mbiguity is a creature not [just] of definitional possibilities but [also] of statutory context.'" Id. (quoting Brown v. Gardner, 513 U.S. 115, 118 (1994)).

According to the government, section 3(a)(2)(C)(ii)(II) of the Small Business Act does not apply because the SBA is "specifically authorized by statute" to prescribe size standards that are not subject to the limitations set forth in section 3(a)(2)(C), including the limitation imposed by section 3(a)(2)(C)(ii)(II) as amended by the Runway Extension Act. The Court agrees with this interpretation of the statute because section 3(a)(2)(A) provides the SBA with specific authority to "specify detailed definitions or standards" for categorizing a business concern as small. In addition, section 3(a)(2)(B) gives the SBA specific authority to employ a broad range of relevant factors when crafting its standards, including "number of employees, dollar volume of business, net worth, net income, a combination thereof, or other appropriate factors." The SBA, in short, is not bound by the limitations imposed by subparagraph (C) because its authority to regulate is governed by subparagraphs (A) and (B). See also 15 U.S.C. § 634(b)(6) (giving the SBA Administrator the authority to "make such rules and regulations as he deems necessary to carry out the authority vested in him").

The Court is not persuaded by BTAS's contention that the broad grant of regulatory authority and discretion given to the SBA under subparagraphs (A) and (B) of section 3(a)(2) do not supply "specific[] authoriz[ation]" to deviate from the limitations imposed by section 3(a)(2)(C) because neither subparagraph (A) nor (B) expressly authorizes the SBA to employ a three-year averaging period. 15 U.S.C. § 632(a)(2)(C). As noted, in interpreting particular statutory language, the Court must read the language in context. In addition, the Court is required to avoid interpreting one part of a statute in a way that makes another provision inconsistent, meaningless, or superfluous. TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001). Under section 3(a)(2)(C), federal agencies, unless specifically authorized to do so, may not prescribe size standards unless they are "approved by the Administrator." 15 U.S.C. § 632(a)(2)(C)(iii). BTAS's argument that section 3(a)(2)(C) applies to size standards issued by the SBA itself renders the separate approval requirement superfluous.

Indeed, a textual analysis reveals that section 3(a)(2) assigns the SBA two distinct sets of responsibilities with respect to the prescription of size standards. Subparagraphs (A) and (B) give the SBA the authority to establish standards and subparagraph (C) assigns the SBA the job of approving the standards other agencies propose to establish. See also 15 U.S.C. § 632(a)(3) (referring to the Administrator's authority to "establish[] or approv[e] any size standard pursuant to [section 3(a)(2)]") (emphasis supplied).

10

BTAS's contention that its interpretation of the statutory language is supported by the legislative history is equally unpersuasive. Thus, it cites the initial draft of section 3(a)(2)(C) which was reported out by the Senate Committee on Small Business in 1994. That draft stated that "[u]nless specifically authorized by statute, the Secretary of a department or the head of a Federal agency, <u>other than the Administrator of the Small Business Administration</u>, may not prescribe for the use of such department or agency a size standard for categorizing a business concern as a small business concern, unless such proposed size standard . . . provides for determining . . . the size of a concern providing services on [the] basis of the annual average gross receipts of the concern over a period of not less than three years[.]" S. 2060, 103d Cong. § 507 (as reported by S. Comm. on Small Bus., Aug. 11, 1994) (emphasis supplied). BTAS points out that the language "other than the Administrator of the Small Business Administration[,]" was removed before the 1994 act was finalized. <u>Compare</u> <u>id.</u>, <u>with</u> Small Business Administration Reauthorization and Amendments Act of 1994, Pub. L. No. 103-403, 108 Stat. 4175. According to BTAS, this shows that in the end "Congress did not intend to except SBA from also complying with, among other things, the 3 (now 5-year) period of measurement outlined in [s]ection 3(a)(2)(C)." Pl.'s Reply in Supp. of its Mot. for J. on the Admin. R. and Opp'n to Def.'s Cross-Mot. for J. on the Admin. R. at 15, ECF No. 23.

The Court does not find this piece of legislative history especially illuminating. As the Supreme Court has "repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 568 (2005). That is because "legislative history is itself often murky, ambiguous, and contradictory." <u>Id.</u> "Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in 'looking over a crowd and picking out your friends.'" <u>Id.</u>

The kind of history upon which BTAS relies is especially unreliable as an indicator of Congressional intent. A change in the wording of a statutory provision after it is first reported out of committee does not really reveal much of anything about the intent of the entire Congress when it passed the final bill. Further, the implication BTAS draws from the change is not the only one that might be drawn. It is entirely possible that sometime between the committee report and the bill's final passage it was decided by the drafters that the committee language explicitly excepting the SBA from section 3(a)(2)(C) was redundant and therefore unnecessary.

Moreover, the inference BTAS would have the Court draw based on this history is undermined by language in the Senate Report on the final bill. It states that the purpose of the 1994 amendment was to "clarif[y] that a Federal Department or agency, <u>other than the [SBA]</u>, may issue a size standard set in terms of number of employees, average annual gross receipts, or otherwise, only under certain conditions." S. Rep. No. 103-332, at 13 (1994) (emphasis added). "Those conditions," the Senate Report explained, "are that the standard is set by rulemaking, including a proposal and an opportunity for public comment, and that the SBA Administrator has approved the standard." <u>Id.</u>

For similar reasons, the Court rejects BTAS's reliance on language in the 2018 report of the House Committee on Small Business concerning the Runway Extension Act, stating that "H.R. 6330 lengthens the time in which the Small Business Administration (SBA) measures size

11

through revenue, from the average of the past 3 years to the average of the past 5 years." H.R. Rep. No. 115-939, at 2 (2018). It may well be that House Committee members who drafted the report believed that by amending section 3(a)(2)(C) they would be mandating that the SBA adopt at least a five-year average when prescribing its own standards (as opposed to merely mandating that it not approve size standards proposed by other federal agencies that do not adopt that longer averaging period). But if that were their intent, the language of the bill Congress ultimately passed did not reflect it. And the floor statements BTAS cites to the same effect "rank among the least illuminating forms of legislative history." N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 943 (2017).

Finally, even if the Court were to find the statutory language ambiguous, it would be required to defer to the SBA's interpretation of section 3(a)(2)(C) because it is based on a "permissible" and reasonable interpretation of the statute. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 (1984). An agency's interpretation of a statute it is charged with administering need only be a reasonable one, and it is controlling "unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Id. at 844; see Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218 (2009) (explaining that Chevron deference does not require that the agency's interpretation be "the only possible interpretation, nor even the interpretation deemed most reasonable by the courts").

In this case, the SBA has long interpreted section 3(a)(2)(C) as inapplicable to the SBA's own standards. Indeed, it has reiterated this understanding of the statute in the Federal Register dozens of times. SBA Notice of Proposed Rulemaking, 84 Fed. Reg. 29399-01 (June 24, 2019) ("Since 2002, SBA has repeated this interpretation of section 3(a)(2)(C) in the Federal Register 52 times."). Because the SBA's interpretation of section 3(a)(2)(C) is at the very least a reasonable one, the agency is entitled to Chevron deference.

In short, section 3(a)(2)(C)(ii)(II) of the Small Business Act does not apply to size standards that the SBA itself promulgates. Therefore, the SBA's decision finding that it was proper to apply a three-year period to determine BTAS's average annual receipts was correct, and BTAS's protest must fail.

> **B.** **In Any Event, the Five-Year Averaging Requirement Contained in the Runway Extension Act Did Not Go into Effect Until the Change Was Published in Final Form After a Period of Notice and Comment**

BTAS argues that the Runway Extension Act was effective upon enactment and that it immediately superseded the SBA's existing regulation at 13 C.F.R. § 121.104(c)(1), which then directed the use of a three-year averaging period to calculate a business concern's annual receipts. Pl.'s Mot. for J. on the Admin. R. at 7, ECF No. 21. For the reasons set forth above, the Court is of the view that section 3(a)(2)(C)(ii)(II) of the Small Business Act as amended by the Runway Extension Act is inapplicable to the SBA. But even if the Court were to find the provision applicable, there is no merit to BTAS's argument that the Runway Extension Act amendment would have the effect of immediately superseding existing regulations.

As BTAS observes, the "general rule" is that "when a statute has no effective date . . . it takes effect on the date of its enactment." Johnson v. United States, 529 U.S. 694, 702 (2000) (quoting Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991)). Therefore, BTAS is correct that the Runway Extension Act became effective December 17, 2018. But acknowledging that the amendment to the Small Business Act became effective on December 17, 2018 begs the critical question of what effect the amendment had on the existing size standard regulations, which used a three-year averaging period for annual receipts.

The answer to this question cannot be, as BTAS argues, that the Runway Extension Act immediately nullified the existing three-year averaging period and replaced it with a five-year averaging period. Congress could not have intended that the new requirement imposed by the amendment would immediately supersede the existing regulations because, for one thing, the Runway Extension Act's substitution of the number "5" for the number "3" was not self-executing. As amended, section 3(a)(2)(C)(ii)(II) does not require that average annual receipts be calculated on the basis of a specific time period (i.e., five years). Rather, assuming its applicability to the SBA, its effect was to cabin the SBA's discretion so that whatever averaging period it chose would be at least five years long. To effect this new requirement, therefore, the agency would necessarily have to promulgate new regulations.

Moreover, the very section of the Small Business Act that the Runway Extension Act amended (section 3(a)(2)(C)) prohibits agencies from prescribing new size standards unless they are promulgated in final form after notice and an opportunity for public comment. 15 U.S.C. § 632(a)(2)(C)(i). The Runway Extension Act had no effect on this requirement. And section 3(a)(6) of the Small Business Act similarly requires the SBA to use notice and comment rulemaking "to revise, modify or establish size standards." 15 U.S.C. § 632(a)(6).

Further, had Congress intended the change in the averaging period to be implemented immediately, it could have so indicated in the Runway Extension Act. But the Act did not direct the SBA to promulgate interim regulations that would be immediately effective. To the contrary, as noted, it amended a section of the statute that explicitly requires that notice and comment rulemaking procedures be followed. And, although Congress has done so in other instances under the Small Business Act, it did not set a deadline for the SBA to take administrative action in the Runway Extension Act. See 15 U.S.C. § 632(a)(4)(A) ("Not later than 30 days after January 6, 2006, the Administrator shall review the application of size standards established pursuant to paragraph (2)."); National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat. 2000 ("Not later than 180 days after the date of enactment of this Act, the Administrator of the Small Business Administration . . . shall issue guidance pertaining to the amendments made by this title to the Small Business Act and . . . shall provide notice and opportunity for comment on such guidance for a period of not less than 60 days.").[5]

---

[5] See also Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-187, 130 Stat. 549 ("The Administrator of the Small Business Administration shall issue regulations to implement the amendment [to 15 U.S.C. § 632] not later than 90 days after the date of the enactment of this Act."); National Defense Authorization Act for Fiscal Year 2014, Pub. L. 113-66, 127 Stat. 672 ("No later than 18 months after the date of the enactment of this Act, the Administrator of the Small Business Administration shall promulgate any regulations necessary,

Finally, for the reasons set forth above, the SBA is entitled to Chevron deference with respect to this issue of statutory construction as well. Therefore, even assuming that the Runway Extension Act were viewed as ambiguous as to this point, the SBA's determination that new regulations were required to effect the statutory change in the averaging period was reasonable and must be sustained.

In short, the Court concludes that the Runway Extension Act's no less than five-year averaging period was intended to be implemented through the promulgation of new regulations. Until new regulations were prescribed, the existing regulations controlled. Assuming, therefore, that the SBA's regulatory authority is limited by the provision of the Small Business Act that the Runway Extension Act amended, BTAS's protest must still be rejected.

## CONCLUSION

Based on the foregoing, BTAS's motion for judgment on the administrative record, ECF No. 21, is **DENIED**. The government's cross-motion for judgment on the administrative record and response in opposition to Plaintiff's motion, ECF No. 22, is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side will bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

and the Federal Acquisition Regulation shall be revised, to implement this section and the amendments made by this section."); National Defense Authorization Act for Fiscal Year 2013, Pub. L. 112-239, 126 Stat. 1632 ("Not later than 180 days after the date of enactment of this part, the Administrator of the Small Business Administration shall issue guidance with respect to the changes made to the Small Business Act by the amendments in this subtitle, with opportunities for notice and comment."); National Defense Authorization Act for Fiscal Year 2006, Pub. L. 109-163, 119 Stat. 3136 ("Not later than 45 days after the date of enactment of this Act, the Administrator of the Small Business Administration shall promulgate final rules to carry out this section and the amendments made by this section.").